## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| KEVIN P. TILLEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 25-1972 (SLS) |
| | ) | |
| FEDERAL BUREAU OF INVESTIGATION, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

**TABLE OF CONTENTS**

**Page(s)**

TABLE OF CONTENTS………………………………………………………………………….i

TABLE OF AUTHORITIES…………………………………………………………………..iv

INTRODUCTION……………………………………………………………………………...1

BACKGROUND………………………………………………………………………………..1

LEGAL STANDARDS………………………………………………………….…….…..5

      A.       Federal Rule of Civil Procedure 12(b)(1)……………………………………....5

      B.       Federal Rule of Civil Procedure 12(b)(6)……………………………………5

ARGUMENT………………………………………………………………………………...6

I.     TILLEY'S COMPLAINT IS NOT MOOT, BECAUSE THIS COURT MAY STILL GRANT ALL OF THE RELIEF HE REQUESTED EXCEPT A RETURN TO DUTY…...……………………………………………………………………...6

II.    TILLEY'S CLAIMS ARE JUSTICIABLE UNDER *Dep't of Navy v. Egan*, 484 U.S. 518 (1988) AND *Lee v. Garland*, 120 F.4th 880 (D.C. Cir. 2024), BECAUSE HE CHALLENGES THE FBI'S AUTHORITY TO SUSPEND HIS CLEARANCE AND HIM FROM DUTY, AS WELL AS THE FBI'S FAILURE TO FOLLOW EXECUTIVE BRANCH PROCEDURES RELATED TO SECURITY CLEARANCES, NOT THE MERITS OF HIS SECURITY CLEARANCE SUSPENSION……………………………………………………………………...8

      A.       Neither *Egan* nor *Lee*, Are Applicable to Tilley's Claims, Because They Addressed Challenges to the Merits of Security Clearance Decisions, not Procedural Challenges..…………….…………………………………..…8

      B.       Under Supreme Court Precedent Regarding the Political Question Doctrine, Tilley's Claims Are Justiciable……………………………………………10

      C.       Recent Decisions in This District Confirm Tilley's Claims Are Justiciable………..12

      D.       A Key Difference Between Tilley's Claims and Other Cases Is That He Does Not Seek Access to Classified Information……………………………………13

III.    THE CSRA DOES NOT PRECLUDE TILLEY'S SINGLE APA CLAIM IN
        COUNT THREE BECAUSE HE CHALLENGES THE FBI'S FAILURE TO
        FOLLOW REGULATIONS REGARDING HIS SECURITY CLEARANCE...........14

        A.    Congress Has Made It Clear that Security Clearances Are Separate from
              Federal Employment Actions.………………………………………….........15

        B.    Supreme Court Precedent Regarding the CSRA Shows that Tilley's APA
              Claim Is Not Precluded.………………………………………………….16

        C.    The *Thunder Basin* Factors Show Congress Did Not Intend to Preclude Review….17

IV.    TILLEY'S CONSTITUTIONAL CLAIMS ARE NOT BARRED BY SOVEREIGN
        IMMUNITY BECAUSE HE DOES NOT SEEK MONEY DAMAGES….……...……18

V.     TILLEY HAS A PROTECTED PROPERTY INTEREST IN HIS
        SECURITY CLEARANCE……………………………………………………….22

VI.    TILLEY'S COUNT FOUR ULTRA VIRES CLAIM IS REVIEWABLE
        BY THIS COURT, AND HIS COUNT ONE ULTRA VIRES CLAIM IS
        REVIEWABLE IF HIS COUNT THREE APA CLAIM IS UNREVIEWABLE…..…26

        A.    Tilley's Ultra Vires Claims Meet the Standards for Nonstatutory Review
              Described in *Leedom v. Kyne*, 358 U.S. 184 (1958) and Related Cases.………...26

              1.    Neither of Tilley's Ultra Vires Claims Are Expressly Precluded
                    by the CSRA……………………………………….………………….27

              2.    There Is No Alternative Review for Tilley's Ultra Vires Claims, If His
                    APA Claim Is Precluded.………………………………………….....28

              3.    The FBI Has Acted in Excess of Its Delegated Powers and Contrary to
                    Specific Prohibitions that Are Clear and Mandatory……………………28

                    a.    Count One Ultra Vires Claim Related to the Suspension of a
                          Security Clearance…………………………………………..……29

                    b.    Count Four Ultra Vires Claim Related to the FBI's Assertion
                          that a Security Clearance is a Condition of Employment……………..30

        B.    Supreme Court Precedent Confirms that Tilley's Ultra Vires Claims
              Are Reviewable……………………………………………………...32

              1.    The FBI's Suspension of Tilley's Security Clearance Is Even More
                    Clearly in Conflict with the Authority Delegated by the President
                    in *Greene*.…………………………………………………...............34

ii

2.    *Greene*'s Rationale Applies Equally to the FBI's Ultra Vires
      Requirement that Employees Maintain a Security Clearance...…………..…35

CONCLUSION…………………………………………………………………………………..37

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Almaqrami v. Pompeo*, 933 F.3d 774 (D.C. Cir. 2019)……………………………………..6–7, 7

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009)…………………………………………………………….5

*Atherton v. D.C. Office of Mayor*, 567 F.3d 672 (D.C. Cir. 2009)…………………………….26

*Baker v. Carr*, 369 U.S. 186 (1962)……………………………………………………..10, 11

*Bd. of Governors of the Fed. Reserve Sys. v. MCorp Financial, Inc.*, 502 U.S. 32 (1991)…………27

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)……………………………………………5, 5–6

*\*Bowen v. Massachusetts*, 487 U.S. 879 (1988)………….…………………….....................20, 21

*Cafeteria and Rest. Workers Union, Local 473, AFL-CIO v. McElroy*,
    367 U.S. 886 (1961)…………………………………………….………..……...36

*Chamber of Commerce of U.S. v. Reich*, 74 F.3d 1322 (D.C. Cir. 1996)………………………….19

*\*Cleveland Bd. Of Educ. v. Loudermill*, 470 U.S. 532 (1985)………………………….23, 23–24, 24

*Cofield v. United States*, 64 F. Supp. 3d, 206 (D.D.C. 2014)………………………………….19

*Damus v. Nielsen*, 313 F. Supp. 3d 317 (D.D.C. 2018)…………………………………………11

*Dart v. United States*, 848 F.2d 217 (D.C. Cir. 1988)……………………………………….....28

*Dep't of Navy v. Egan*, 484 U.S. 518 (1988)………………8, 9–10, 12, 13, 14, 16, 16–17, 22, 23, 37

*Doe v. Cheney*, 885 F.2d 898 (D.C. Cir. 1989)……………………………………………........22

*Doe v. Patel*, No. 25-04258 (D.D.C. Dec. 8, 2025) (complaint) [ECF Doc. 1]…………..……….37

*Elgin v. Dep't of Treasury*, 567 U.S. 1 (2012)…………………………………………….14, 27

*FDIC v. Meyer*, 510 U.S. 471 (1994)……………………………………………………….19

*Filebark v. U.S. Dep't of Transp.*, 555 F.3d 1009 (D.C. Cir. 2009)……………………………..14

*Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*,
    561 U.S. 477 (2010)..........................................................................15, 17, 18

*Goldberg v. Kelly*, 397 U.S. 254 (1970)…………………………………………………….23

*\*Greene v. McElroy*, 360 U.S. 474 (1959)…………………23, 24, 25, 32, 32–33, 33, 34, 35, 36, 37

*Herbert v. Nat'l Acad. of Scis.*, 974 F.2d 192 (D.C. Cir. 1992)……………………………….4 n.3, 5

*Hubbard v. Adm'r, EPA*, 982 F.2d 531 (D.C. Cir. 1992) (en banc)…………………………..20–21, 21

*Lee v. Garland*, 120 F.4th 880 (D.C. Cir. 2024)……………………………...8, 9, 10, 12, 13, 14, 34, 37

*\*Leedom v. Kyne*, 358 U.S. 184 (1958)……………………………………………………..26, 37

*Lujan v. Defs. of Wildlife*, 504 U.S. 555 (1992)……………………………………………….5

*Nat'l Fed'n of Fed. Emps. v. Greenberg*, 983 F.2d 286 (D.C. Cir. 1993)……………………….13

*Nat'l Whistleblower Ctr. v. Dep't of Health and Human Svcs.*,
    839 F. Supp. 2d 40 (D.D.C. 2012)……………………………………………………..5

*Nyunt v. Chairman, Broad. Bd. of Governors*,
    589 F.3d 445 (D.C. Cir. 2009)……………………………..............................26, 27, 28, 33, 37

*Oryszak v. Sullivan*, 576 F.3d 522 (D.C. Cir. 2009)……………………………………………10

*Panhandle E. Pipe Line Co. v. Fed. Energy Regulatory Comm'n*,
    613 F.2d 1120 (D.C. Cir. 1979)……………………………………………………….11

*Parkinson v. Dep't of Justice*, 874 F.3d 710 (Fed. Cir. 2017) (en banc)……………………...27

*Perkins Coie LLP v. U.S. Dep't of Justice*, 783 F. Supp. 3d 105 (D.D.C. 2025)……..……..12, 13, 29

*\*Romero v. Dep't of Def.*, 527 F.3d 1324 (Fed. Cir. 2008)……………………..………….9, 11, 15

*\*Service v. Dulles*, 354 U.S. 363 (1957)…………………………………………………….11, 12

*Sloan v. U.S. Dep't of Hous. & Urban Dev.*, 236 F.3d 756 (D.C. Cir. 2001)……………..……...19

*Susman Godfrey LLP v. Exec. Office of President*,
 789 F. Supp. 3d 15 (D.D.C. 2025)…...……………………………………...12, 13, 29
*Thunder Basin Coal Co. v. Reich*, 510 U.S. 200 (1994)……………………………….....14, 15, 17
*United States v. Fausto*, 484 U.S. 439 (1988)……………………………………………...16, 17, 27
*United States v. Testan*, 424 U.S. 392 (1976)…………………………..……………..21
*Whitman v. Dep't of Transp.*, 547 U.S. 512 (2006)………………………………………...14
*Wilmer Cutler Pickering Hale and Dorr LLP v. Exec. Office of President*,
 784 F. Supp. 3d 127 (D.D.C. 2025)……………………………………………...12, 13, 29
*Zaid v. Exec. Office of President*, No. 25-01365-AHA,
 2025 WL 3724884  (D.D.C. Dec. 23, 2025)……………………………………………12
*Zukerman v. U.S. Postal Serv.*, 961 F.3d 431 (D.C. Cir. 2020)…………………….………...7
*Zummer v. Sallet*, 37 F.4th 996 (5th Cir. 2022)………………………………….……37

## Constitutional Provision

U.S. CONST. art. III, § 2, cl. 1……………………………………………….….........6

## Statutes and Rules

5 U.S.C. § 702.........................................................................................18–19, 21
5 U.S.C. § 706(2)(A)…………………………………………………………….………4
5 U.S.C. § 706(2)(B)……………………………………………………………..…..4, 19
5 U.S.C. § 706(2)(D)………………………………………………………………….4
5 U.S.C. § 5596(b)(1)…………………………………………………………………22
5 U.S.C. § 7513…………………………………………………………………….…8
12 U.S.C. § 1818(i)(1)…………………………………………………………………27
28 U.S.C. § 1346(b)…………………………………………………………………...19
50 U.S.C. § 3003(4)…………………………………………………………………...31
50 U.S.C. § 3003(4)(H)………………………………………………………………31
50 U.S.C. § 3023(a)(B)(1)……………………………………………………………31
50 U.S.C. § 3023(j)……………………………………………………………………31
50 U.S.C. § 3341(d)…………………………………………………15, 18, 24, 34
50 U.S.C. § 3341(j)………………………………………………………………..15, 17
50 U.S.C. § 3341(j)(6)………………………………………………………………15
50 U.S.C. § 3341(j)(7)……………………………………………………15, 16, 28
50 U.S.C. § 3341(j)(9)…………………………………………………………………18
Federal Rule of Civil Procedure 8(d)(2)………………………………………….28
Federal Rule of Civil Procedure 12(b)(1)…………………………………………4, 5, 6
Federal Rule of Civil Procedure 12(b)(6)…………………………………4, 5, 6, 26

## Executive Orders and Regulations

Executive Order No. 12,968 § 1.1(e)………………………………………………17–18
Executive Order No. 12,968 § 1.2(a)………………………………………………13, 25
Executive Order No. 12,968 § 2.1(a)…………………………………………………32
Executive Order No. 12,968 § 2.1(b)………………………………………………..30
Executive Order No. 12,968 § 2.1(b)(1)..……………………………………………30

Executive Order No. 12,968 § 2.1(b)(2)...…………………………………………………..30
Executive Order No. 12,968 § 3.1(b)………………………………………………………13
Executive Order No. 12,968 § 5.1………………………………………………….……….29
Executive Order No. 12,968 § 5.2………………………………………………………24, 29
Executive Order No. 13,526 § 4.1(a)……………………………………….……13–14, 25
5 C.F.R. §  550.803(a)……………………………………………………………….22
28 C.F.R. § 17.44(a)…………………………………………………………………..32
28 C.F.R. § 17.44(b)…………………………………………………….…..30–31, 31
28 C.F.R. § 17.47……………………………………………………….…………17, 24, 29, 33

**INTRODUCTION**

Defendant Federal Bureau of Investigation ("FBI") unlawfully claims that it has the authority to suspend employees' security clearances without any process, when neither the President nor the Department of Justice ("DOJ") have granted it such authority. Also, the President's Executive Order and DOJ regulations regarding security clearances mandate a process before revoking a security clearance. Similarly, the FBI unlawfully claims that it has the authority to make a security clearance a condition of employment, when no such authority is granted by the President or DOJ or in the FBI's own employment agreement. Also, such a requirement violates the President and DOJ's mandates that the FBI should limit the number of clearances necessary to perform the FBI's functions, since large numbers of FBI employees have no need to access classified information in their jobs investigating criminal matters. The FBI unlawfully suspended Plaintiff Kevin P. Tilley's ("Tilley) security clearance and unlawfully suspended him from duty without pay for over three years.

**BACKGROUND**

Tilley[1] was employed by the FBI as a special agent. ECF Doc. 1 ("Compl.") ¶ 41. He had a top secret security clearance.[2] *Id.* ¶ 42. Tilley was assigned to investigate crimes against children and human trafficking in the FBI's Seattle, Washington Division. *Id.* ¶ 44. Although Tilley had a security clearance, he was assigned to investigate purely criminal matters wholly unrelated to

---

[1] This action was originally filed with two plaintiffs. The other plaintiff was Timothy Kobelia. Kobelia's claims were dismissed pursuant to a settlement agreement in which the FBI agreed to pay him damages and adjust its records to reflect that he retired in good standing from the FBI upon its reinstatement of his security clearance. ECF Doc. 8.

[2] For the remainder of this opposition, Tilley will refer to his eligibility to access classified information as a "security clearance" or "clearance," with the understanding that the quoted executive orders and regulations refer to a "clearance" as "eligibility" or "eligibility to access" classified information.

national security. In that assignment, he did not have a need-to-know classified material in order to perform the lawful duties to which he was assigned. *Id.* ¶ 45. The Seattle Division where Tilley worked has a Sensitive Compartmented Information Facility ("SCIF") in the office where employees assigned to national security matters requiring access to classified material perform their duties. Tilley was not assigned to work within the SCIF. *Id.* ¶ 46. Approximately during July 2020, Tilley completed his probationary period as an FBI employee. *Id.* ¶ 47. On or about March 14, 2021, Tilley was notified by FBI management that a misconduct complaint was filed against him, and he was placed on paid administrative leave. *Id.* ¶ 48. Approximately two weeks later, Tilley was returned to duty. *Id.* ¶ 49. During September and October 2021, Tilley or his counsel was informed that local officials declined to take action against him. *Id.* ¶¶ 51–52. Tilley notified his chain of command of the declination by local officials. *Id.* ¶ 53.

On November 19, 2021, Tilley was notified that his security clearance was suspended. *Id.* ¶ 55. On November 22, 2021, Tilley received a letter dated November 17, 2021, notifying him that the basis for the suspension of his clearance was the same complaint on which local officials had recently declined to take further action. The letter provided no information or evidence to support the claim Tilley engaged in wrongdoing. *Id.* ¶ 56. In the letter, Tilley was advised that the "'suspension of your clearance will continue until the FBI investigation of the underlying matter is completed. At that time, your clearance status will be re-evaluated, and you will be advised accordingly.'" *Id.* ¶ 57.

On November 22, 2021, Tilley also received a letter dated November 18, 2021, notifying him that he was suspended indefinitely from duty and pay effective upon receipt of the letter. The November 18, 2021, letter notified him that his indefinite suspension from duty and pay was based on the decision to suspend his Top Secret security clearance and access to classified information.

The letter advised him that "[his] suspension will be in effect pending the final resolution of all security actions including investigation, adjudication, and any related appeals regarding [his] eligibility to access classified information, and/or a determination of whether or not further administrative action is warranted.'" *Id.* ¶ 59. In the November 18, 2021, letter, the FBI asserted that, "'[i]t has been a longstanding, essential condition of employment that employees of the FBI be able to obtain and maintain a Top Secret security clearance,'" but cited no authority for that claim. *Id.* ¶ 60. Nothing in the FBI Employment Agreement states that FBI employees are required to maintain their clearance to access classified information. *Id.* ¶ 61. Tilley received his last paycheck from the FBI during February 2022. *Id.* ¶ 62.

Tilley requested the materials that served as the basis for the suspension of his security clearance but those were not provided. *Id.* ¶ 63. On June 22, 2023, Tilley voluntarily subjected himself to a polygraph examination by the FBI's Security Division ("SecD"), which conducts security clearance investigations and adjudications of FBI employees. During the polygraph, he denied any allegation of wrongdoing against him. SecD notified his attorney in an administrative action that he passed the examination. *Id.* ¶ 64. Tilley and his attorney in the administrative action were told by SecD personnel that SecD had made an adjudication decision on his security clearance. It was strongly implied by SecD personnel that they had recommended reinstatement of his security clearance. As of August 2023, the adjudication decision was with the final FBI decisionmaker. *Id.* ¶ 65. In September 2024, another unit in the FBI determined the allegation of wrongdoing that was the basis for suspending Tilley's security clearance was unsubstantiated. *Id.* ¶ 66. Tilley's clearance has been suspended since November 2021 without any decision, deadline, or hearing to refute allegations made against him. *Id.* ¶ 67.

On March 7, 2025, separate from the security clearance matter, the FBI's Office of

Professional Responsibility ("OPR") decided to remove Tilley from the FBI based upon three minor administrative violations that it substantiated but Tilley disputes. Declaration of Michael Zummer ("Decl.") ¶ 7.[3] OPR's decision was subject to an appeal to the FBI's Office of Disciplinary Appeals and was not a final agency decision. *Id.* ¶ 8. Tilley's attorney in the administrative action filed a notice of appeal with the FBI on March 17, 2025. *Id.* ¶ 9. After this lawsuit was filed on June 24, 2025, Tilley's administrative appeal brief was filed on August 25, 2025. *Id.* ¶ 10. The FBI reviewed his appeal on October 28, 2025, and Tilley did not receive the FBI's final removal decision until October 30, 2025. *Id.* ¶ 11. Tilley filed a Title VII discrimination action related to his removal, which is still pending. *Id.* ¶ 12.

On June 24, 2025, Tilley filed this action. In Count One of the Complaint, Tilley challenges the suspension of his security clearance as an ultra vires violation of the FBI's authority under the Constitution, Executive Orders, and Code of Federal Regulations ("C.F.R."). Compl. ¶¶ 99–117. In Count Two, Tilley challenges the suspension of his security clearance as a violation of his Fifth Amendment rights. *Id.* ¶¶ 118–124. In Count Three, he challenges the suspension of his security clearance as a violation of the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 706(2)(A),(B),(D). *Id.* ¶¶ 125–126. In Count Four, Tilley challenges his indefinite suspension from duty without pay as an ultra vires violation of the FBI's authority under the Constitution, Executive Orders, and C.F.R. *Id.* ¶¶ 127–149. In Count Five, Tilley challenges his indefinite suspension from duty without pay as a violation of his Fifth Amendment rights. *Id.* ¶¶ 150–152.

Defendants filed a motion to dismiss on March 2, 2026, under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), arguing: 1) Tilley's complaint is moot, 2) his claims are non-justiciable, 3) his non-constitutional claims are barred by the Civil Service Reform Act ("CSRA"),

---

[3] A court may consider facts outside the pleadings when deciding whether it has jurisdiction. *Herbert v. Nat'l Acad. of Scis.*, 974 F.2d 192, 197 (D.C. Cir. 1992).

4) his constitutional claims are barred by sovereign immunity, 5) he has no property interest in his security clearance, and 6) his ultra vires claims fail. ECF Doc. 11.

**LEGAL STANDARDS**

### A.       Federal Rule of Civil Procedure 12(b)(1).

Motions filed under Rule 12(b)(1) allow a party to challenge the Court's subject matter jurisdiction, *see* Fed. R. Civ. P. 12(b)(1), and the burden of proof for a Rule 12(b)(1) motion to dismiss falls on the party asserting jurisdiction. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). "In evaluating a motion to dismiss under Rule 12(b)(1), the Court must 'treat the complaint's factual allegations as true . . . and must grant plaintiff 'the benefit of all inferences that can be derived from the facts alleged.'" *Nat'l Whistleblower Ctr. v. Dep't of Health and Human Svcs.*, 839 F. Supp. 2d 40, 44 (D.D.C. 2012) (citations omitted). "The Court need not accept as true, however, 'a legal conclusion couched as a factual allegation,' nor an inference unsupported by the facts set forth in the Complaint." *Id.* (citations omitted). Unlike with a motion to dismiss under Rule 12(b)(6), when deciding a motion to dismiss under Rule 12(b)(1), a "court may consider the complaint supplemented by undisputed facts evidenced in the record, or the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *Herbert*, 974 F.2d at 197.

### B.       Federal Rule of Civil Procedure 12(b)(6).

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing

5

*Twombly*, 550 U.S. at 556). However, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citing *Twombly*, 550 U.S. at 555).

## ARGUMENT

As an initial matter, Tilley's claims are not mooted by his subsequent, separate removal from the FBI, because this Court may still grant some relief requested in the suit, specifically back pay, benefits—such as credit towards retirement—and the reinstatement of his security clearance. Furthermore, his claims are justiciable because they are procedural claims related to the FBI's authority to suspend security clearances and employees from duty without pay when their clearances are suspended, not the merits of the FBI's security clearance decision. Similarly, the CSRA does not preclude his non-constitutional claims, because they are challenges to security clearance procedures and Congress did not include security clearances under the CSRA. As to his constitutional claims, Congress has waived sovereign immunity through its general waiver under the APA. Also, under Supreme Court precedent, the well-established procedures related to the revocation of security clearances give him a protected property interest in his clearance. Finally, if no other review is available, non-statutory review of his ultra vires claims is available because the FBI has no authority to take the challenged actions and those actions are prohibited by Executive Orders and the C.F.R. Thus, dismissal under either Federal Rule of Civil Procedure 12(b)(1) or Rule 12(b)(6) is inappropriate.

I. **TILLEY'S COMPLAINT IS NOT MOOT, BECAUSE THIS COURT MAY STILL GRANT ALL OF THE RELIEF HE REQUESTED EXCEPT A RETURN TO DUTY.**

A federal court's jurisdiction is limited to cases or controversies. U.S. CONST. art. III, § 2, cl. 1. "A lawsuit becomes moot—and is therefore no longer a 'Case' or 'Controversy'—'when the issues presented are no longer "live" or the parties lack a legally cognizable interest in the

outcome.'" *Almaqrami v. Pompeo*, 933 F.3d 774, 779 (D.C. Cir. 2019) (citations omitted). A case becomes moot only if, assuming the plaintiff prevails, "'it is impossible for a court to grant [her] any effectual relief whatever.' We must assume that the plaintiff will 'prevail' unless her argument that the relief sought is legally available and that she is entitled to it is 'so implausible that it is insufficient to preserve jurisdiction.'" *Id.* (citations omitted). "'As long as the parties have a concrete interest, however small, in the outcome of the litigation, the case is not moot.'" *Zukerman v. U.S. Postal Serv.*, 961 F.3d 431, 442 (D.C. Cir. 2020) (citations omitted).

Tilley does not dispute that he has been removed from the FBI through proceedings separate from his security clearance issues. He disputes the timing of that removal, since he had a pending appeal of FBI OPR's decision to the FBI's Office of Disciplinary Appeals at the time this lawsuit was filed. Decl. ¶¶ 8–10. Tilley did not receive the FBI's final removal decision until October 30, 2025. *Id.* ¶ 11. Still, the disagreement over when his removal was final does not affect the mootness question. He admits the FBI has made a final agency decision to remove him since the filing of this lawsuit, although he has pending Title VII discrimination claims related to his removal. *Id.* ¶ 12.

His removal from the FBI by means other than the security clearance matter only prevents this Court from ordering one portion of the relief he seeks, return to duty as an FBI agent. Compl. ¶ 154. While this Court cannot return Tilley to duty as an FBI agent, it can order reinstatement up to the date of his removal. Such relief would include adjusting the FBI's records to show he remained an active FBI employee until the date of his removal. Also, Tilley specifically asked this Court to order the FBI to provide him with "full back pay and benefits," *id.*, and his removal does not prevent this Court from ordering the FBI to reinstate him to duty with full back pay and benefits from the date of his suspension on November 22, 2021, to the date of his removal in 2025. Benefits

7

would include credit towards a federal retirement or at least the opportunity for him to contribute to the retirement system for that credit as though he had never been suspended.

Tilley also asked this Court to order the FBI to reinstate his security clearance, although not his access to classified material. *Id.* ¶ 156. Since the FBI has taken no further action on his security clearance, his clearance would be active and available for him to seek employment with another federal agency or contractor if it had not been unlawfully suspended.

Because Tilley still has a concrete, lawfully cognizable interest in the outcome of this litigation after his removal, this case is not moot.

**II.    TILLEY'S CLAIMS ARE JUSTICIABLE UNDER *Dep't of Navy v. Egan*, 484 U.S. 518 (1988) AND *Lee v. Garland*, 120 F.4th 880 (D.C. Cir. 2024), BECAUSE HE CHALLENGES THE FBI'S AUTHORITY TO SUSPEND HIS CLEARANCE AND HIM FROM DUTY, AS WELL AS THE FBI'S FAILURE TO FOLLOW EXECUTIVE BRANCH PROCEDURES RELATED TO SECURITY CLEARANCES, NOT THE MERITS OF HIS SECURITY CLEARANCE SUSPENSION.**

**A.    Neither *Egan* nor *Lee*, Are Applicable to Tilley's Claims, Because They Addressed Challenges to the Merits of Security Clearance Decisions, not Procedural Challenges.**

Tilley does not dispute that *Dep't of Navy v. Egan*, 484 U.S. 518 (1988) and *Lee v. Garland*, 120 F.4th 880 (D.C. Cir. 2024) generally indicate that court challenges to the merits of a security clearance decision are non-justiciable. However, he is not challenging the merits of the FBI's decision to suspend his security clearance. Instead, he is challenging the FBI's authority to suspend clearances at all, the FBI's failure to follow procedures mandated in the C.F.R. and executive orders, and the FBI's authority to suspend him from duty because his clearance was suspended. Neither *Egan* nor *Lee* hold that such challenges are non-justiciable and other precedents show that those challenges are justiciable.

The question presented in *Egan* was whether 5 U.S.C. § 7513 authorized the Merit Systems

8

Protection Board ("MSPB") to "examine the merits of [a] security-clearance denial." 488 U.S. at 526. The Court held that while the MSPB has jurisdiction to review adverse personnel actions, "[a] denial of a security clearance is not such an 'adverse action,' and by its own force is not subject to [MSPB] review." *Id.* at 530. In making that decision, the Court relied heavily on the President's authority as the Commander in Chief of the Army and Navy. It observed that the President's authority to classify and control access to information and "to determine whether an individual is sufficiently trustworthy to occupy a position in the Executive Branch that will give that person access to such information flows primarily from this constitutional investment of power in the President and exists quite apart from any explicit congressional grant." *Id.* at 527.

Nothing in *Egan* insulates the FBI's actions from judicial review when it assumes powers not granted to it by the President and fails to follow procedures prescribed by the President.

In *Lee*, the plaintiff only challenged the merits of the revocation of his security clearance in court, not its suspension, by bringing claims under the First and Fifth Amendments and Title VII. 120 F.4th at 885. While Tilley brings a Fifth Amendment due process claim, like Lee did, Lee's claim was not procedural. He complained that the justification for the revocation of his clearance was pretextual because blips on a polygraph were not large enough to indicate deception, and that there was insufficient investigation after the polygraph. *Id.* at 894. Lee's claims were essentially challenges to the merits of the clearance decision. He made no claim that the FBI exceeded the authority it derives from the President or failed to follow the procedures mandated by the President's orders and regulations.

In *Lee*, 120 F. 4th at 891, the D.C. Circuit relied heavily on *Egan*, as the basis for its decision. However, *Egan* did not preclude court challenges to an agency's unauthorized actions. In fact, the Federal Circuit has observed that "the government in *Egan* itself acknowledged that

9

the [MSPB] may review whether the agency has complied with its procedures for revoking a security clearance, even though it may not review the substance of the revocation decision." *Romero v. Dep't of Def.*, 527 F.3d 1324, 1329 (Fed. Cir. 2008).

The FBI's reliance on *Oryszak v. Sullivan* is similarly mistaken, because the Secret Service agent in that case challenged the revocation of her security clearance under the APA as "arbitrary, capricious, and an abuse of discretion for want of evidence she had passed [counterfeit] currency knowingly." 576 F.3d 522, 524 (D.C. Cir. 2009). She challenged the merits of the security clearance determination. The D.C. Circuit held that it was a decision committed to agency discretion. *Id.* Thus, *Oryszak* is inapplicable to Tilley's challenge of the FBI's procedures and authorities regarding clearances.

### B. Under Supreme Court Precedent Regarding the Political Question Doctrine, Tilley's Claims Are Justiciable.

Tilley's claims are justiciable under the political question doctrine factors outlined by the Supreme Court in *Baker v. Carr*, 369 U.S. 186 (1962). As the D.C. Circuit observed in *Lee*, the two most important *Baker* factors are whether there is a textually demonstrable constitutional commitment of the issue to a coordinate political department or a lack of judicially discoverable and manageable standards for resolving it. 120 F.4th at 888–89 (citing *Baker*, 369 U.S. at 217). While the appeals court determined that those factors indicated that the claims in *Lee* were non-justiciable, those factors do not indicate challenges to an agency's unauthorized action are.

Regarding the first *Baker* factor, whether there is a textually demonstrable commitment of the issue to a coordinate political department, there is no doubt that the President controls access to national security information. No one disputes that here. However, the FBI has exceeded the authority that it derives from the President by suspending employees' security clearances when there is no provision for doing so in executive orders or regulations, and it has also failed to follow

10

the procedures mandated by the President and regulations to revoke clearances. As the Court opined in *Baker*, the courts "will not stand impotent before an obvious instance of a manifestly unauthorized exercise of power." 369 U.S. at 217. The FBI's actions against Tilley are just such manifestly unauthorized exercises of power.

The second *Baker* factor—whether there are judicially discoverable and manageable standards for resolving the matter—confirms that Tilley's claims are justiciable. They are the sort of claims routinely decided by courts. As discussed above, the Federal Circuit has held that the MSPB can review whether agencies have followed procedures regarding security clearance determinations. *Romero*, 527 F.3d at 1329–30. Also, "[i]t has become axiomatic that an agency is bound by its own regulations," and courts will set aside agency decisions where they violated their own regulations. *Panhandle E. Pipe Line Co. v. Fed. Energy Regulatory Comm'n*, 613 F.2d 1120, 1135–36 (D.C. Cir. 1979). Courts can review agencies' violations of their own regulations under the APA. *Damus v. Nielsen*, 313 F. Supp. 3d 317, 336–37 (D.D.C. 2018).

Since at least 1957, the Supreme Court has recognized that courts may set aside national security decisions that were made in violation of agencies' own regulations. In *Service v. Dulles*, a foreign service officer was removed from employment after he had been arrested under the Espionage Act, but a grand jury would not indict him. 354 U.S. 363, 365 (1957). Then Secretary of State Dulles relied solely on a Loyalty Review Board decision to remove Service without making an independent determination. *Id.* at 368–69. The Court held that the removal was invalid because the State Department had failed to follow its own regulations. *Id.* at 382, 388–89.

Tilley has not been accused of anything like espionage. In fact, the allegations that served as the basis for his clearance suspension have been unsubstantiated. Compl. ¶ 66. Tilley's former duties at the FBI had nothing to do with national security, let alone a foreign service officer's level

11

of national security responsibilities. He did not even need access to classified material, nor was he assigned to the SCIF at the FBI's Seattle field office. *Id.* ¶¶ 45–46. Yet, Tilley has received nowhere near the process that Service received. He has not received any process at all.

Thus, Tilley's claims are reviewable under judicially discoverable and manageable standards.

### C.  Recent Decisions in This District Confirm Tilley's Claims Are Justiciable.

The inapplicability of *Egan* and *Lee* to Tilley's claims is confirmed by recent decisions by other courts in this District related to the recent attempts by President Trump to revoke the security clearances of law firms and an individual attorney ("attorney cases"). In *Perkins Coie LLP v. U.S. Dep't of Justice*, the court relied in part on the fact that the executive order suspending the law firm members' clearances was not an individualized determination, but a general policy applied to a group of people. 783 F. Supp. 3d 105, 142–43 (D.D.C. 2025), *appeal docketed*, No. 25-5241 (D.C. Cir. July 2, 2025). Similarly, in *Susman Godfrey LLP v. Exec. Office of President*, the court relied on the fact that the decision was not an individualized determination. 789 F. Supp. 3d 15, 38 (D.D.C. 2025), *appeal docketed*, No. 25-5310 (D.C. Cir. Aug. 26, 2025). In *Wilmer Cutler Pickering Hale and Dorr LLP v. Exec. Office of President*, the court relied on the fact that the decision was not an individualized determination, but also determined that the *Lee* did not apply because WilmerHale was challenging "the President's process—or lack thereof—in suspending the firm's employees' security clearances." 784 F. Supp. 3d 127, 148–49 (D.D.C. 2025), *appeal docketed*, No. 25-5277 (D.C. Cir. July 28, 2025).

Also, in *Zaid v. Exec. Office of President*, the court reviewed the President's decision to revoke the clearance of an individual whistleblower attorney. No. 25-01365-AHA, 2025 WL 3724884, *1  (D.D.C. Dec. 23, 2025), *appeal docketed*, 26-5009 (D.C. Cir. Jan. 13, 2026). The

court decided that Zaid's claims were justiciable because he was not challenging an individualized national security determination but "the legality of denying him any such individualized review." *Id.* at \*3. The government revoked his clearance "without any of the process it usually affords . . . ." *Id.*

While the decisions in *Perkins Coie*, *Susman Godfrey*, *Wilmer*, and *Zaid* are on appeal to the D.C. Circuit, those decisions relied on another D.C. Circuit case, *Nat'l Fed'n of Fed. Emps. v. Greenberg*, 983 F.2d 286 (D.C. Cir. 1993). In *Greenberg*, the court determined that *Egan* did not preclude review of federal employees' Fifth Amendment challenges to a questionnaire they were required to answer for their security clearances. 983 F.2d at 287–88, 289–90. Like the employees in *Greenberg* and the attorney cases, Tilley does not challenge the merits of his security clearance suspension. He challenges the process, or lack thereof. However, his case is much stronger than the attorney cases. The President—in whom the Constitution vests the authority to control access to national security information—did not decide to suspend or revoke his clearance. The FBI made the decision in excess of the authority granted to it by the President.

### D. A Key Difference Between Tilley's Claims and Other Cases Is That He Does Not Seek Access to Classified Information.

*Egan* and *Lee* are also inapplicable, because Tilley does not seek access to classified information. Those cases did not distinguish between clearances, which are referred to in Executive orders as "eligibility," and access to classified information. A clearance will be granted only to "United States citizens for whom an appropriate investigation has been completed and whose personal and professional history affirmatively indicates loyalty to the United States" and a variety of other marks of good character. Executive Order No. 12,968 § 3.1(b), Aug. 2, 1995, 60 Fed. Reg. 40250 (Aug. 7, 1995). However, access will only be granted after an individual has a clearance and has a need-to-know classified information. Executive Order No. 12,968 § 1.2(a), *id.*

13

at 40246; Executive Order No. 13,526 § 4.1(a), Dec. 29, 2009, 75 Fed. Reg. 720 (Jan. 5, 2010). Since Tilley is not requesting access, just the procedural protections the President requires the FBI to provide to its employees before taking his clearance, the concerns for national security information are not the same as they were in *Egan* and *Lee*.

Because Tilley challenges the FBI's authority to suspend his clearance, its authority to suspend him from duty after suspending his clearance, and its failure to provide him the process mandated by the President and regulations, his claims are justiciable.

**III.    THE CSRA DOES NOT PRECLUDE TILLEY'S SINGLE APA CLAIM IN COUNT THREE BECAUSE HE CHALLENGES THE FBI'S FAILURE TO FOLLOW REGULATIONS REGARDING HIS SECURITY CLEARANCE.[4]**

Tilley acknowledges that he is a nonpreference eligible excepted service employee with no right to appeal adverse actions to the MSPB under Title 5, Chapter 75. He also agrees that the CSRA generally precludes use of the APA "to challenge agency employment actions." *Filebark v. U.S. Dep't of Transp.*, 555 F.3d 1009, 1010 (D.C. Cir. 2009). However, as the Supreme Court concluded in *Whitman v. Dep't of Transp.*, since 28 U.S.C. § 1331 grants jurisdiction to district courts over questions of federal law, the question this Court must answer is whether the CSRA removed jurisdiction over Plaintiff's APA claim. 547 U.S. 512, 513–14 (2006).

In *Elgin v. Dep't of Treasury*, 567 U.S. 1, 9–10 (2012), the Court relied on the factors it described in *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200 (1994), to determine whether the CSRA precluded district court review of constitutional claims by federal employees covered by the CSRA. In *Thunder Basin*, the Court explained that provisions for agency review do not restrict judicial review unless the statutory scheme displays a fairly discernible intent to limit jurisdiction, and the claims at issue "are of the type Congress intended to be reviewed within th[e] statutory

---

[4] Tilley will separately address the issue of CSRA preclusion related to his ultra vires claims in Section VI below, because that review is conducted under a different standard.

structure." 510 U.S. at 207, 212. "Generally, when Congress creates procedures 'designed to permit agency expertise to be brought to bear on particular problems,' those procedures 'are to be exclusive.'" *Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 489 (2010) (citation omitted). "But [the Court] presume[s] that Congress does not intend to limit jurisdiction if 'a finding of preclusion could foreclose all meaningful judicial review'; if the suit is 'wholly collateral to a statute's review provisions'; and if the claims are 'outside the agency's expertise.'" *Id.* (quoting *Thunder Basin*, 510 U.S. at 212–13). Analyzing this question under *Thunder Basin*, the CSRA does not preclude judicial review of APA challenges to violations of regulations related to security clearances.

### A. Congress Has Made It Clear that Security Clearances Are Separate from Federal Employment Actions.

Congress could not have intended to restrict judicial review of security clearance procedural issues through the CSRA, because it never mentioned security clearances in it. Meanwhile Congress has enacted separate limited legislation related to security clearances apart from the CSRA. In 50 U.S.C. §§ 3341(d),(j), without providing procedural protections for security clearance holders, Congress mandated, among other things, the reciprocity of security clearance and access investigations and a means to challenge retaliatory revocations of security clearances and access determinations. Congress mandated that nothing in § 3341 would be construed as providing judicial review for any agency action under that section or of the appellate review procedures it provides. § 3341(j)(6). However, Congress did not limit judicial review of *other* security clearance actions, except that nothing in § 3341 would "be construed to permit, authorize, or require a private cause of action to challenge the *merits* of a security clearance determination." § 3341(j)(7) (emphasis added.) Congress clearly knows how to limit causes of action, including potential causes of action outside of § 3341, like Tilley's, but it intentionally restricted those limits

15

to merits of security clearance determinations, not violations of regulations.

This is consistent with the Federal Circuit's decision in *Romero* discussed in Section II.A above that the MSPB can review procedural errors in security clearance matters. 527 F.3d at 1329–30. The MSPB can perform that review, because 50 U.S.C. § 3341(j)(7) did not take it away. Since the CSRA is silent about security clearance matters, there is no basis to believe that Congress intended that legislation to preclude Tilley's opportunity to obtain review of such procedural matters under the APA. This is especially true since Congress codified limits to the review of the merits of security clearance determinations in Title 50, which deals with national security matters, not Title 5, which deals with federal government organization and employment matters.

**B. Supreme Court Precedent Regarding the CSRA Shows that Tilley's APA Claim Is Not Precluded.**

In *United States v. Fausto*, the Supreme Court held that nonpreference excepted service employees are not entitled to judicial review of personnel actions under Chapter 75, which would cover indefinite suspensions greater than fourteen days like Tilley's if he were in the competitive service. 484 U.S. 439, 448–49, 455 (1988). In that decision, the Court relied on its observations about the "comprehensive nature of the CSRA, the attention that it gives throughout to the rights of nonpreference excepted service employees, and the fact that it does not include them in provisions for administrative and judicial review contained in Chapter 75 . . . ." *Id.* at 448.

Of course, the sole basis for Tilley's suspension from duty was the suspension of his security clearance, and the Court made a landmark decision about clearances approximately a month after deciding *Fausto*. Despite the comprehensive nature of the CSRA it described in *Fausto*, the Court decided in *Egan* that Congress had not spoken specifically enough in the CSRA to include MSPB review of the merits of security clearance determinations. 484 U.S. at 530. A security clearance determination is not an adverse action under the CSRA. *Id.* Thus, *Egan*

16

confirms that Congress did not address—one way or another—whether clearances could be reviewed or excluded from other judicial review under the CSRA, because Congress did not address them in the Act. Because Congress was silent about clearances in the CSRA, it is fairly discernible that Congress did not intend to preclude APA review of regulatory challenges to security clearances. They were not the type of claims that Congress intended to be reviewed in the CSRA's statutory structure.

Finally, there is another significant difference between Tilley's APA claim and the claim at issue in *Fausto*, besides the fact that Tilley is challenging the procedures related to his security clearance. As discussed in Sections II.A and III.A above, the MSPB can review procedural claims related to security clearances. So, review of the same type of claims under the APA will not give Tilley greater review than a competitive service employee's review under the CSRA, which was one of the Court's concerns about the excepted service employee obtaining review in *Fausto*. 484 U.S. at 449–50.

### C. The *Thunder Basin* Factors Show Congress Did Not Intend to Preclude Review.

As the Court explained in *Free Ent. Fund*, Congress is presumed not to have intended to preclude all meaningful judicial review. 561 U.S. at 489. Holding that the CSRA precluded review of Tilley's APA claim would do just that, outside of his ultra vires claims.

Also, security clearance proceedings are wholly collateral to the CSRA's review provisions. The CSRA channels review to the MSPB and does not address clearances at all. Also, Congress has provided for a whistleblower security clearance review procedure in Title 50, 50 U.S.C. § 3341(j), not the CSRA. Other security clearance proceedings are conducted under Executive Order 12,968 and the C.F.R, specifically 28 C.F.R. § 17.47 for FBI and other DOJ employees. Furthermore, security clearances are routinely provided to contractors, Executive

Order 12,968 § 1.1(e), 60 Fed. Reg. 40245, or even lawyers at law firms, as described in the attorney cases cited in Section II.C above. Also, Congress has specifically mandated that security clearances and access determinations must be reciprocal between agencies. 50 U.S.C. § 3341(d). Contractors are treated the same as employees under that statute. 50 U.S.C. § 3341(j)(9). Thus, it is evident that clearance proceedings are wholly collateral to the CSRA.

Finally, Tilley agrees that *merits* determinations of security clearances are clearly within the FBI's expertise, which is why the courts and Congress have specifically excluded them from review. However, he asks for a review of *procedural* issues and whether the FBI has the authority to take the actions that it did. His claims are "standard questions of administrative law, which the courts are at no disadvantage in answering." *Free Enter. Fund*, 561 U.S. at 491.

Therefore, the CSRA does not preclude review of Tilley's APA claim in Count Three of the complaint.

## IV. TILLEY'S CONSTITUTIONAL CLAIMS ARE NOT BARRED BY SOVEREIGN IMMUNITY BECAUSE HE DOES NOT SEEK MONEY DAMAGES.

Tilley agrees with the FBI that sovereign immunity bars any money damages for his constitutional claims, but he does not seek money damages. Tilley's constitutional claims are asserted in Counts Two and Five of his complaint. The suspension of his clearance and his suspension from duty without notice and an opportunity to be heard were in violation of his Fifth Amendment Due Process rights. Although Tilley agrees that he cannot be reinstated to duty as an FBI agent because of his removal in a separate proceeding, reinstatement up to his removal date would entitle him to an adjustment of his record as an active FBI employee for the period, back pay and benefits for the period of his suspension, including credit towards retirement. He also seeks the reinstatement of his security clearance. As he asserted in his complaint at ¶ 2, sovereign immunity for such relief was waived under the APA, 5 U.S.C. § 702, which authorizes "[a] person

18

suffering legal wrong because of agency action" to seek "relief other than money damages . . . ." Although Tilley's constitutional claims were not brought under the APA, the D.C. Circuit has determined that the "APA's waiver of sovereign immunity applies to any suit whether under the APA or not." *Chamber of Commerce of U.S. v. Reich*, 74 F.3d 1322, 1328 (D.C. Cir. 1996). He also asserted that the relief he sought was authorized under this Court's equitable powers. Compl. ¶ 2. Under Supreme Court precedent, none of the relief he seeks is money damages. Thus, sovereign immunity is waived under the APA or, alternatively, relief is available under this Court's equitable jurisdiction to provide injunctive relief.

In its discussion of sovereign immunity, the FBI solely relies on cases addressing claims under the Federal Tort Claims Act ("FTCA"), which waives sovereign immunity for tort claims under state law. 28 U.S.C. § 1346(b). However, Tilley has not asserted any claims under the FTCA, and he does not assert that the FTCA waived sovereign immunity for his constitutional claims. Thus, *Cofield v. United States*, which involved an FTCA claim, not an APA waiver of sovereign immunity, 64 F. Supp. 3d, 206, 213 (D.D.C. 2014), is inapplicable. *FDIC v. Meyer* is also inapplicable, since it did not address sovereign immunity under the APA. In *Meyer*, the court held that there was no cause of action for constitutional claims under the FTCA. 510 U.S. 471, 477 (1994). It did not address the issue of whether the APA waived sovereign immunity for constitutional claims seeking reinstatement of an employee. Finally, *Sloan v. U.S. Dep't of Hous. & Urban Dev.* is also inapplicable because it involved an FTCA claim. 236 F.3d 756, 757 (D.C. Cir. 2001). None of the cases cited by the FBI address the APA's waiver of sovereign immunity.

Of course, the APA does address constitutional claims, because it specifically authorizes suits to hold unlawful and set aside agency action "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B). Thus, its waiver of sovereign immunity includes

19

constitutional claims.

The APA does not allow money damages, though. Yet there is a difference between money damages that are not authorized by the APA and monetary payments resulting from an order to set aside agency action that is authorized by the APA. The Supreme Court addressed this issue in *Bowen v. Massachusetts*, 487 U.S. 879 (1988). In that case, the Court held that a state's APA claim against the federal government seeking payment for Medicaid services was "not a suit seeking money in *compensation* for the damages sustained by the failure of the Federal Government to pay as mandated; rather, it is a suit seeking to enforce the statutory mandate itself, which happens to be one for the payment of money." *Id.* at 900 (emphasis in original). The Court explained that the "fact that the mandate is one for the payment of money must not be confused with the question whether such payment, in these circumstances, is a payment of money as damages or as specific relief." *Id.* at 900–01.

The Court specifically used the reinstatement of an employee with back pay as an example of an equitable action for specific relief, not money damages. "Our cases have long recognized the distinction between an action at law for damages—which are intended to provide a victim with monetary compensation for an injury to his person, property, or reputation—and an equitable action for specific relief" such as "the reinstatement of an employee with backpay . . . ." *Id.* at 893. Thus, the APA waives sovereign immunity for any claims, including constitutional claims, seeking specific relief associated with reinstatement, such as back pay or benefits, which would include credit towards retirement.

There is an important distinction between plaintiffs like Tilley, who have been removed from a position that they already held, and those seeking back pay when they have been wrongly prevented from taking a new position. The en banc D.C. Circuit held that the APA did not waive

20

sovereign immunity for a plaintiff who claimed he had not been given a federal job in reprisal for his First Amendment speech. He was seeking instatement, not *re*instatement. *Hubbard v. Adm'r, EPA*, 982 F.2d 531, 532 (D.C. Cir. 1992) (en banc). The court reasoned that "[s]pecific remedies 'attempt to give the plaintiff the very thing to which he was entitled.' At the time the EPA violated Hubbard's rights by denying him an offer of a job . . . , he had never worked for the EPA and thus was not entitled to any pay." *Id.* at 533 (citation omitted). The D.C. Circuit relied upon the Supreme Court's decision in *United States v. Testan*, where the Court observed that the "established rule is that one is not entitled to the benefit of a position until he has been duly appointed to it." 424 U.S. 392, 402 (1976). In the case of a wrongful suspension, "at least since the Civil Service Act of 1883, the employee is entitled to the emoluments of his position until he has been legally disqualified." *Id*.

Tilley was appointed to the position of an FBI agent for a few years, and he had completed his probationary period. Compl. ¶ 47. He was entitled to the emoluments of that position until he had been legally disqualified. Instead, the FBI violated his Fifth Amendment rights by suspending his clearance and suspending him from duty without pay. Therefore, *Bowen* and the reasoning from *Testan* are controlling: his request for relief seeking back pay and other benefits is specific relief for which the APA waives sovereign immunity. It is not money damages.

Thus, Tilley's request for back pay concurrent with a reinstatement, now applicable to the date of his removal[5], is not money damages within the meaning of 5 U.S.C. § 702, and sovereign immunity has been waived. Even if back pay were not available, Tilley seeks the reinstatement of his security clearance which is not money damages. Also, a reinstatement to duty to the date of his removal would include the adjustment of his record to reflect that he remained as an FBI agent

---

[5] If his Title VII action challenging his removal, Decl. ¶ 12, is successful, he may be reinstated to full duty.

21

during the period of his suspension. Such an adjustment would include credit towards retirement for that period. While credit towards retirement involves a financial payment into the retirement system similar to back pay, it is also an opportunity to pay into that system separate from the government's contribution. Thus, even if back pay were not available, an opportunity for Tilley to pay into the retirement system himself would be.

Finally, in the alternative, if back pay were not available as specific relief, an order from this Court that Tilley's record be corrected to show him as an active FBI employee up to the date of his removal would still be significant. Under OPM regulations implementing the Back Pay Act, 5 U.S.C. § 5596(b)(1), a court is an "appropriate authority" under that Act for which an employee can request back pay for an "unwarranted or unjustified personnel action." 5 C.F.R. § 550.803(a). So, Tilley could seek back pay through an administrative request to the FBI.

Tilley's constitutional claims are not barred by sovereign immunity.

## V.    TILLEY HAS A PROTECTED PROPERTY INTEREST IN HIS SECURITY CLEARANCE.[6]

Tilley does not dispute that numerous courts have opined that no one has a right to a security clearance. Those decisions are based on the Supreme Court's statement in *Egan* that "[i]t should be obvious that no one has a 'right' to a security clearance." 484 U.S. at 528. The D.C. Circuit relies on this statement from *Egan* in determining that federal employees do not have a right to a security clearance. *Doe v. Cheney*, 885 F.2d 898, 909–10 (D.C. Cir. 1989). However, *Egan* is inapplicable to the question of whether an individual has a protected property interest in a clearance that has already been granted, because that case involved the denial of a clearance to an individual. 484 U.S. at 520. It did not address the revocation of an individual's clearance. Thus, a protected property interest could not have attached in *Egan*.

---

[6] Tilley does not allege that he has a liberty interest in his security clearance.

The Court previously decided a case involving the revocation of a clearance already granted to an individual quite differently than *Egan*. In *Greene v. McElroy*, the Court decided that—without explicit authorization from either the President or Congress—an individual could not be denied a fair hearing in the revocation of his security clearance because it affected his ability to obtain other employment as an aeronautical engineer. 360 U.S. 474, 475–76, 508 (1959). While not specifically deciding that Greene had a protected property interest in his clearance, the Court explained that certain principles have remained relatively immutable in its jurisprudence. "One of these is that where governmental action seriously injures an individual, and the reasonableness of the action depends on fact findings, the evidence used to prove the Government's case must be disclosed to the individual so that he has an opportunity to show that it is untrue." *Id.* at 496. The "Court has been zealous to protect these rights from erosion. It has spoken out not only in criminal cases . . . but also in all types of cases where administrative and regulatory actions were under scrutiny." *Id.* at 497 (citations omitted).

This immutable principle has served as the basis to hold that other government benefits may not be ended or revoked without a hearing. In *Goldberg v. Kelly*, the Court observed that "[r]elevant constitutional restraints apply as much to the withdrawal of public assistance benefits as to disqualification for unemployment compensation; or to denial of a tax exemption; or to discharge from public employment." 397 U.S. 254, 262 (1970) (citations omitted). In deciding whether a public employee had a protected property interest in continued public employment, the Court explained that property interests "'are created and their dimensions are defined by existing rules or understandings that stem from an independent source . . . .'" *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 538 (1985) (citations omitted). In *Loudermill*, that source was Ohio state law that entitled classified civil service employees to their positions during good behavior

23

and efficient service and did not allow their dismissal except for misfeasance, malfeasance, or nonfeasance in office. *Id.* at 538–39.

Similar to the protections at issue in *Loudermill*, once granted, Tilley's clearance could not be revoked except under the procedures outlined in Executive Orders and the C.F.R. It could not be suspended at all. Under Executive Order 12,968 § 5.2, clearance holders are entitled to notice, including a written explanation of the basis for revoking a clearance, the opportunity to review documents upon which a revocation is based, an opportunity to respond in writing to the determination, the opportunity to appeal a final determination, and the opportunity for a hearing. 60 Fed. Reg. 40252. These same procedures are provided specifically to DOJ employees, including FBI employees, in 28 C.F.R. § 17.47. Thus, Executive Order 12,968 and the C.F.R., while not statutory law, provide independent sources for rules and understandings that create a protected property interest in a security clearance once it has been granted. Neither requirement allows for the suspension of a security clearance.

Furthermore, as discussed in Section III above, Congress has mandated that clearances must be reciprocal between agencies. 50 U.S.C. § 3341(d). It is a transferrable benefit that—like the clearance in *Greene*—affects their ability to obtain employment with the government and in the private sector with government contractors. Thus, statutory law provided by Congress provides an independent source of rules and understandings that, along with orders and regulations, creates a protected property interest.

The creation of a protected property interest in a security clearance by executive order, the C.F.R., and statute is further confirmed by the FBI's reference to such provisions in its own employment agreement. According to that agreement, its "provisions are consistent with and do not supersede, conflict with, or otherwise alter the employee obligations, rights, or liabilities

24

created by existing statute or Executive order relating to (1) classified information . . . ." Furthermore, the agreement provides that "[t]he definitions, requirements, obligations, rights, sanctions, and liabilities created by controlling Executive orders and statutory provisions are incorporated into this agreement and are controlling." Compl. ¶ 25, Exh. A, ECF Doc. 1-1.

National security concerns do not affect this conclusion. First, the Supreme Court has already indicated in *Greene* that such procedures are necessary in security clearance revocations to protect individuals from governmental actions that seriously injure them. Since the FBI uses— without any authority—security clearances as a condition of employment, security clearance suspensions are a means to summarily indefinitely suspend an employee's career without any recourse. Second, constitutional due process protections would essentially provide the same procedures that the President has already ordered the FBI to provide its employees through their Executive Orders and the C.F.R. Third, clearances do not mandate access to classified information and Tilley is not requesting such access. As discussed above, individuals may only have access when they have a need-to-know, Executive Order No. 12,968 § 1.2(a), Executive Order No. 13,526 § 4.1(a)(3), and Tilley does not dispute that the FBI may suspend his access to classified information at any time. He seeks the reinstatement of his clearance, because the FBI uses it as a condition of employment, even when he had no need-to-know classified information while investigating crimes against children and human trafficking. Compl. ¶¶ 44–45.

Tilley has a protected property interest in his security clearance, and his Fifth Amendment Due Process rights were violated when his clearance was suspended indefinitely without notice and a meaningful opportunity to be heard for more than four years and counting.

25

**VI.    TILLEY'S COUNT FOUR ULTRA VIRES CLAIM IS REVIEWABLE BY THIS COURT, AND HIS COUNT ONE ULTRA VIRES CLAIM IS REVIEWABLE IF HIS COUNT THREE APA CLAIM IS UNREVIEWABLE.**

Tilley makes two separate ultra vires claims. In Count One, Tilley addresses the regulations, executive orders, and other authorities related to his claim that the FBI has no authority to suspend security clearances and is prohibited from doing so by those authorities. In Count Four, he addresses the regulations, executive orders, and other authorities related to his claim that the FBI has no authority to suspend him from employment because of the loss of his security clearance. While there is some overlap between the cited authorities and there are several involved in each count, these authorities are necessary to properly notify the FBI of the claims and the grounds upon which they rest as required under Federal Rule of Civil Procedure 12(b)(6). *Atherton v. D.C. Office of Mayor*, 567 F.3d 672, 681 (D.C. Cir. 2009).

**A. Tilley's Ultra Vires Claims Meet the Standards for Nonstatutory Review Described in *Leedom v. Kyne*, 358 U.S. 184 (1958) and Related Cases.**

In *Leedom v. Kyne*, the Supreme Court held that an unlawful action by an agency that injured the plaintiff was reviewable, because the suit was not one to review the agency's action within its jurisdiction but to strike down an agency decision "made in excess of its delegated powers and contrary to a specific prohibition in" an Act. 358 U.S. 184, 188 (1958). The D.C. Circuit has observed that nonstatutory review under *Kyne* applies only where "(i) the statutory preclusion of review is implied rather than express; (ii) there is no alternative procedure for review of the statutory claim; and (iii) the agency plainly acts 'in excess of its delegated powers and contrary to a specific prohibition in the' statute that is 'clear and mandatory.'" *Nyunt v. Chairman, Broad. Bd. of Governors*, 589 F.3d 445, 449 (D.C. Cir. 2009) (citations omitted).

### 1. Neither of Tilley's Ultra Vires Claims Are Expressly Precluded by the CSRA or Other Statutes.

Nothing in the CSRA expressly precludes jurisdiction over either of Tilley's ultra vires claims. As the Supreme Court described in *Elgin*, the CSRA simply "channels judicial review . . . to a particular court." 567 U.S. 1 at 9. The CSRA's preclusion of court review under other statutes is based on courts' perception of it as providing a comprehensive scheme, *Fausto*, 484 U.S. at 448–49, not an explicit denial of jurisdiction in the Act. Of course, at least two judges on the court to which the CSRA channels judicial review have described the Act's structure after years of congressional additions and amendments as "riddled with inconsistencies and puzzling provisions. Sometimes, parsing the variety of statutes that could be invoked as applicable to a particular personnel problem is akin to predicting divine will by studying animal entrails, as was done by the Etruscans and Romans." *Parkinson v. Dep't of Justice*, 874 F.3d 710, 718 (Fed. Cir. 2017) (en banc) (Plager, J., dissenting) (citation omitted). The CSRA does not speak with sufficient clarity to expressly preclude jurisdiction over Tilley's ultra vires claims.

The Supreme Court has determined that the sort of express statutory provision necessary to defeat nonstatutory review is the provision in the Financial Institutions Supervisory Act that "'[N]o court shall have jurisdiction to affect by injunction or otherwise the issuance or enforcement of any [Board] notice or order under this section.'" *Bd. of Governors of the Fed. Reserve Sys. v. MCorp Financial, Inc.*, 502 U.S. 32, 44 (1991) (quoting 12 U.S.C. § 1818(i)(1)). There is no such provision in the CSRA, and the D.C. Circuit did not find one when it addressed nonstatutory review of a possible CSRA claim in *Nyunt*, 589 F.3d at 449. Of course, as discussed in Section III above, the CSRA does not address security clearances at all, so it could not expressly preclude Tilley's ultra vires claim in Count One any more than it could implicitly preclude review of his APA claim related to his security clearance.

Furthermore, the D.C. Circuit decided in *Dart v. United States* that "[n]othing in the subsequent enactment of the APA altered [nonstatutory] review," and "[w]hen an executive acts *ultra vires*, courts are normally available to reestablish the limits on his authority." 848 F.2d 217, 224 (D.C. Cir. 1988). Similarly, nothing in the CSRA has altered nonstatutory review of ultra vires acts.

Finally, Congress has expressly precluded causes of action over the merits determinations of security clearances, 50 U.S.C. § 3341(j)(7), but it has not done so with procedural challenges like Tilley's.

Thus, Congress has not expressly precluded review of Tilley's ultra vires claims.

### 2. There Is No Alternative Review for Tilley's Ultra Vires Claims, If His APA Claim Is Precluded.

As to the second factor for nonstatutory review described in *Nyunt*, there is no alternative review for Tilley's claim in Count Four related to the FBI's ultra vires imposition of a security clearance requirement for employment. Tilley agrees with the FBI that his Count One ultra vires claim related to the suspension of his security clearance is similar to his APA claim in Count Three. His Count One ultra vires claim is an alternative claim in case no statutory review of his security clearance suspension is available under the APA. Such an alternative claim is authorized under Federal Rule of Civil Procedure 8(d)(2).

### 3. The FBI Has Acted in Excess of Its Delegated Powers and Contrary to Specific Prohibitions that Are Clear and Mandatory.

As to the third factor, in both ultra vires counts, the FBI has acted in excess of powers delegated to it through the President's national security powers in Article II of the Constitution. The President has authorized the FBI to take certain actions through executive orders and the C.F.R. However, each of the ultra vires claims describe actions taken by the FBI that exceed the

28

FBI's authority and violate those orders and regulations.

### a. Count One Ultra Vires Claim Related to the Suspension of a Security Clearance.

Regarding Count One, the FBI has no authority to suspend security clearances once they have been granted. The FBI does have the authority to determine that an individual no longer needs access to classified information, Executive Order No. 12,968 § 5.1, and consequently may suspend access. However, a security clearance is a different matter than access to classified information. A clearance is a determination of eligibility for access which can only be revoked under certain procedures ordered by the President, *id.* § 5.2, and mandated in regulations, 28 C.F.R. § 17.47. There are no provisions to suspend a clearance.

In some of the attorney cases cited in Section II.C above, the President suspended clearances. *See Perkins Coie LLP v. U.S. Dep't of Justice*, 783 F. Supp. 3d at 142–43; *Susman Godfrey LLP*, 789 F. Supp. 3d at 37–38; *Wilmer Cutler*, 784 F. Supp. 3d at 148–49. Whether the President can suspend a clearance at all or not is irrelevant to Tilley's case, because no President has given that authority to the FBI.

The only means to remove a clearance from an individual once it has been granted are the procedures cited above. Failure to follow those procedures in removing a clearance—whether the FBI declares it a suspension or a revocation—is a violation of the clear and mandatory requirements set by the President and DOJ. This conclusion is further confirmed by the fact that the FBI has suspended Tilley's clearance for more than four years and counting. It is a de facto revocation, and the FBI is attempting to evade the process it is required to follow simply by calling it a suspension. The attorney cases confirm that a suspension of a clearance without following those procedures is prohibited. Even the President must follow them when suspending a clearance.

### b. Count Four Ultra Vires Claim Related to the FBI's Assertion that a Security Clearance is a Condition of Employment.

Under Executive Order 12,968 § 2.1(b), "[t]he number of employees that each agency determines are eligible for access to classified information shall be kept to the minimum required for the conduct of agency functions." 60 Fed. Reg. 40248. Also, under § 2.1(b)(1), "[e]ligibility for access to classified information shall not be requested or granted solely to permit entry to, or ease of movement within, controlled areas when the employee has no need for access and access to classified information may reasonably be prevented." *Id.* Tilley had no need for access to classified information because he was assigned to investigate crimes against children and human trafficking, criminal matters that are wholly unrelated to national security. Compl. ¶¶ 44–45.

To justify its requirement that employees maintain a security clearance, the FBI will presumably cite Executive Order 12,968 § 2.1(b)(2) which states that "*[e]xcept in agencies where eligibility for access is a mandatory condition of employment*, eligibility for access to classified information shall only be requested or granted based on a demonstrated, foreseeable need for access. Requesting or approving eligibility in excess of actual requirements is prohibited." 60 Fed. Reg. 40248 (emphasis added). However, this provision confirms the mandate that agencies must limit clearances, and only allows exceptions where clearances are a mandatory condition of employment. While the FBI claims that a clearance is a condition of employment, nothing in executive orders says that it has any authority to mandate such a condition. It is not even a stated condition in the FBI's own employment agreement, Compl. ¶ 61, Exh. A, ECF Doc. 1-1, which suggests that no such condition exists except when it is convenient for the FBI to assert it.

More importantly, the C.F.R. confirms that the FBI has no authority to make a clearance a condition of employment as an exception to limitations in executive orders. The FBI is a component of DOJ and is subject to its regulations. Those regulations mandate that "[t]he number

30

of employees eligible for access to classified information shall be kept to the minimum required for the conduct of [DOJ] functions." 28 C.F.R. § 17.44(b). DOJ provides no exception to this limitation. Thus, as a component of DOJ, the FBI cannot have an exception to the limitation on clearances because DOJ's regulations have not given it one.

The FBI's attempt to mandate clearances for its employees is in violation of clear and mandatory prohibitions of Executive Order 12,968 and 28 C.F.R. § 17.44(b), because large numbers of FBI employees, including Tilley, have no need to access classified information to perform DOJ functions. While the FBI does perform important national security functions, it is still a law enforcement agency that investigates criminal matters, such as public corruption, civil rights, transnational organized crime, white-collar crime, and violent crime, that have nothing to do with national security and do not require access to classified information. Compl. ¶ 31.

Congress's definition of which agencies—or parts of agencies—are part of the intelligence community confirms that large numbers of FBI employees have no need for security clearances. The intelligence community gathers, analyzes, and produces the vast majority of classified information. The intelligence community's dominance in the area of classified information is confirmed by Congress's placement of the authority to determine procedures related to security clearances and classified information with the head of the intelligence community, the Director of National Intelligence. 50 U.S.C. §§ 3023(a)(B)(1),(j). In some cases, Congress has included entire agencies within its definition of that community, e.g. the Central Intelligence Agency and National Security Agency. 50 U.S.C. § 3003(4) So, it is reasonable for those agencies to require clearances of their employees as a condition of employment. However, Congress has only defined the intelligence elements of the FBI as part of the intelligence community. § 3003(4)(H). The exclusion of a large portion of the FBI from the intelligence community confirms that those same

employees have no need for security clearances.

The FBI's claim on its website that individuals must "be able to obtain an FBI Top Secret clearance" to be eligible for employment with the FBI[7] shows that it is violating additional clear and mandatory prohibitions. Under Executive Order No. 12,968 § 2.1(a), clearance determinations "are separate from suitability determinations with respect to the hiring or retention of persons for employment by the government or any other personnel actions." DOJ mandates the same separation in its regulations. Clearance "[d]eterminations of eligibility for access to classified information are separate from suitability determinations with respect to the hiring or retention of persons for employment by the [DOJ] or any other personnel actions." 28 C.F.R. § 17.44(a). Thus, the FBI is not only violating prohibitions on the number of employee clearances needed to perform its functions discussed above, but it is also violating prohibitions on using clearances as a substitute for employment suitability determinations and personnel actions, like it did when it suspended Tilley from duty.

The FBI's claimed requirement that a security clearance is a condition of employment is in excess of its authority and contrary to clear and mandatory prohibitions.

**B. Supreme Court Precedent Confirms that Tilley's Ultra Vires Claims Are Reviewable.**

The Supreme Court held that courts could review an ultra vires claim similar to Tilley's in *Greene*. In deciding to review an aeronautical engineer's claim that his security clearance had been revoked without due process—causing him to lose his job and other employment—the Court reasoned that the question was "not whether the President has the inherent power to act or whether Congress has granted him such a power, rather, it is whether either the President or Congress exercised such a power and delegated to the Department of Defense the authority to fashion such

---

[7] FBI, Eligibility, https://fbijobs.gov/ (last accessed Mar. 26, 2026).

a program." *Greene*, 360 U.S. at 496. The Court reviewed the orders related to dissemination of classified information active at the time and determined that they did not "empower[] any executive agency to fashion security programs whereby persons are deprived of their present civilian employment and of the opportunity of continued activity in their chosen professions without being accorded the chance to challenge effectively the evidence and testimony upon which an adverse security determination might rest." *Id.* at 502.

After determining that no legislative enactments authorized the revocation process without full hearings, the Court determined that agencies were not authorized to implement such procedures simply through acquiescence of the President or Congress. *Id.* at 504–06. Before deciding whether someone—in the context of security clearance cases—could be deprived of their right to follow their chosen professions without full  hearings where accusers may be confronted, the Court reasoned that "it must be made clear that the President or Congress, within their respective constitutional powers, specifically has decided that the imposed procedures are necessary and warranted and has authorized their use." *Id.* at 507. The Court held that "in the absence of explicit authorization from either the President or Congress the [officials] were not empowered to deprive petitioner of his job in a proceeding in which he was not afforded the safeguards of confrontation and cross-examination." *Id.* at 508.

The Court's reasoning in *Greene* differs significantly from the D.C. Circuit's requirement for nonstatutory review described in *Nyunt* that the ultra vires action was contrary to a specific prohibition that was clear and mandatory. 589 F.3d at 449. In *Greene*, the proceedings were not contrary to any specific prohibition. The Court relied on the fact that the proceedings were not authorized, and they caused significant injury to an individual—the loss of his chosen profession—without traditional procedural protections. Tilley has suffered the same injury—the loss of his

chosen profession—not only without traditional procedural protections, but without the protections mandated by executive order and regulations. Thus, even if the FBI's ultra vires actions were not contrary to a specific prohibition, under *Greene*, nonstatutory review is still available.

Furthermore, *Greene* also shows that the ultra vires actions do not need to be in excess of statutory authority for review. Nonstatutory review is available when executive agencies act in excess of the authority delegated to them by the President and other officers through executive orders and regulations.

*Greene* is controlling over each of Tilley's ultra vires claims.

### 1. The FBI's Suspension of Tilley's Security Clearance Is Even More Clearly in Conflict with the Authority Delegated by the President in *Greene*.

As discussed above, the Department of Defense's revocation of the clearance in *Greene* was not in violation of a clear and mandatory prohibition. In Tilley's case, though, the FBI suspended his clearance indefinitely without any delegated authority to do so and in violation of procedures clearly required under executive order and the C.F.R.

The suspension of Tilley's clearance is different from that in *Greene*, though, because Tilley is not seeking access to classified material. The FBI did not need to suspend Tilley's clearance to protect national security information. It could accomplish that simply by suspending his access that he did not need while he continued to investigate crimes against children and human trafficking.

However, Tilley has the same need for a clearance as Greene to find employment. Not only does the FBI claim it is a requirement for employment, but a clearance is required for jobs and contract work with many agencies. Since Congress has mandated that clearances be reciprocal between agencies, 50 U.S.C. § 3341(d), the FBI is preventing Tilley from finding other employment through its ultra vires suspension of his security clearance without process and

34

without end. Another agency or a government contractor is unlikely to hire Tilley while his clearance is left in an interminable suspended status.

The FBI's determination that the allegation that served as the basis for the suspension of Tilley's clearance was unsubstantiated, Compl. ¶ 66, only confirms the importance of the procedures *Greene* protects. As the Court observed, the "Government's case must be disclosed to the individual so that he has an opportunity to show that it is untrue." *Greene*, 360 U.S. at 496. It is even more important where the evidence consists of the testimony of individuals "whose memory might be faulty or who, in fact, might be perjurers or persons motivated by malice, vindictiveness, intolerance, prejudice, or jealousy." *Id.* The FBI ultimately did not believe the witness or witnesses who caused Tilley's clearance to be suspended. If the FBI had followed the procedures mandated by the President and DOJ, he would not have suffered the grievous injury that he has.

### 2. *Greene*'s Rationale Applies Equally to the FBI's Ultra Vires Requirement that Employees Maintain a Security Clearance.

While the FBI's ultra vires requirement that its employees maintain security clearances does not involve the procedures discussed in *Greene*, it has the same effect of causing great injury without proper authority. Just as the Department of Defense had no authority to implement faulty procedures, the FBI has no authority to require its employees to maintain clearances. (Of course, as discussed above, the FBI's clearance requirement is prohibited.) By unlawfully requiring its employees to maintain clearances, the FBI causes the same injury that Greene suffered, a loss of employment. While FBI employees, like Tilley, only lose their job with the FBI because of the FBI's ultra vires clearance requirement, it is nonetheless their chosen profession. Furthermore, by suspending employees indefinitely without pay while their clearances are suspended, the FBI causes those employees substantial financial distress which appears to be designed to make them

35

resign and save the FBI the effort of providing them the procedural protections to which they are entitled.

Unlike in *Greene*, where the Department of Defense's unauthorized flawed procedures were arguably motivated by a legitimate concern to protect national security, there is no such legitimate concern with the FBI. Large numbers of FBI employees have no need to access classified material. Thus, the FBI's unlawful requirement that employees maintain clearances is significantly different from another Supreme Court case on which the FBI may attempt to rely. In *Cafeteria and Rest. Workers Union, Local 473, AFL-CIO v. McElroy*, the Court held that a military commander summarily denying a civilian employee of a private contractor access to a military installation did not violate the Fifth Amendment Due Process clause. 367 U.S. 886, 894–95 (1961). However, the worker in that case, Rachel Brawner, was not prevented from taking other employment in her chosen profession and she needed access to the base to work there. *Id.* at 896. Tilley has been prevented from being an FBI agent and he has no need to access classified material to do that job. Of course, *Cafeteria and Rest. Workers* is not controlling over Tilley's ultra vires claims, because the commander in that case was acting within his authority, *id.* at 893–94, unlike the FBI.

The FBI's ultra vires actions against Tilley are part of a larger pattern of the FBI management's abuse of its employees through security clearance suspensions and consequent suspensions from duty without pay. The FBI suspended the clearance of Tilley's former co-plaintiff, Tim Kobelia, because he spoke out against security clearance abuses. Compl. ¶¶ 77, 79. The pretextual basis for Kobelia's suspension was his transmission of an unclassified internal FBI Security Division email about lunchtime health and wellness activities, including "Lunch and Coloring" and "Office Yoga," to a fellow FBI employee that someone else provided to a former

36

employee. *Id.* ¶¶ 78, 80. The FBI also used the clearance process to suspend and remove an agent who provided unclassified allegations of prosecutorial misconduct favoring a sexual predator district attorney defendant to the judge presiding over the case. *Zummer v. Sallet*, 37 F.4th 996, 1000–02 (5th Cir. 2022).

Unfortunately, the abuse of FBI employees appears to have gone into high gear recently. Employees have been fired without even bothering to use the pretextual fig leaf of the security clearance process. For example, the FBI summarily dismissed FBI agents who kneeled at a racial justice protest even though the FBI and DOJ had previously cleared them of any misconduct. *Doe v. Patel*, No. 25-04258 (D.D.C. Dec. 8, 2025) (complaint) [ECF Doc. 1] ¶¶ 56, 73–74, 85–87, 109.

While these other cases are not on point with Tilley's ultra vires claims, they confirm the importance of compelling the FBI to follow orders and regulations. All government officials from the President on down are capable of violating individuals' rights, the law, and exceeding their authority for any number of reasons, including ridding themselves of a difficult disciplinary question or an employee who speaks out against abuse. As the Supreme Court explained in *Greene*, individuals who suffer from such abuses, specifically those like Tilley has suffered, must be protected from such abuses in court. While claims under *Kyne* may be a Hail Mary pass, *Nyunt*, 589 F.3d at 449, they are an important part of the Supreme Court's jurisprudence, including review of ultra vires actions just like what the FBI did to Tilley.

## CONCLUSION

Tilley's claims are not moot, nor are they precluded by *Egan*, *Lee*, or the CSRA. Congress has waived sovereign immunity for his constitutional claims, and he has a protected property interest in his security clearance. His ultra vires claims merit nonstatutory review under the *Leedom v. Kyne* exception. This Court should deny Defendants' motion to dismiss and allow this matter to

37

proceed.

Dated: March 30, 2026

Respectfully Submitted,

*/s/ Michael S. Zummer*
Michael S. Zummer
(Bar ID LA0013/La. Bar No. 31375)
2337 Magazine St. Unit D
New Orleans, LA 70130
Telephone: (504) 717-5913
E-mail: afbilitigation@gmail.com
*Counsel for Plaintiff*